**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

In re:

PELCO STRUCTURAL, L.L.C.,

    Debtor.

Case No. 21-11926-JDL
Chapter 11

**SUBMISSION OF AFFIDAVIT
IN SUPPORT OF FIRST DAY MOTIONS**

    Debtor, Pelco Structural, L.L.C., by and through its undersigned counsel, submits the attached Affidavit in Support of First Day Motions.

    PHILLIPS MURRAH P.C.

*/s/ Clayton D. Ketter*
Clayton D. Ketter, OBA No. 30611
Jason M. Kreth, OBA No. 21260
Corporate Tower, 13th Floor
101 North Robinson Avenue
Oklahoma City, OK 73102
(405) 235-4100 - telephone
(405) 235-4133 - facsimile
cdketter@phillipsmurrah.com
jmkreth@phillipsmurrah.com
**Proposed Attorneys for Debtor**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

In re:

PELCO STRUCTURAL, L.L.C.,

    Debtor.

Case No.
Chapter 11

**AFFIDAVIT IN SUPPORT OF FIRST DAY MOTIONS**

STATE OF OKLAHOMA    )
                                   ) SS:
COUNTY OF OKLAHOMA   )

Stephen Parduhn, being first duly sworn, states:

1.    I am the President and CEO of Pelco Structural, L.L.C. (the "Debtor"). I am familiar with the Debtor's day to day operations, business affairs, books and records, and have been authorized by the Debtor to submit this Affidavit.

2.    On July 16, 2021 (the "Petition Date"), the Debtor filed a voluntary petition with this Court pursuant to Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

3.    To minimize the adverse impact of filing for Chapter 11 protection and to enhance its prospect of successful reorganization, the Debtor has filed contemporaneously herewith a number of motions requesting various types of "first day" relief (collectively, the "First Day Motions"). I am familiar with the content of each First Day Motion and believe the relief sought in each (i) is necessary to enable the Debtor to operate in Chapter 11 with minimum disruption; (ii) is critical to the Debtor's achievement of a successful bankruptcy case; and (iii) best serves the Debtor's estate and its creditors' interests.

4.    All statements set forth in this Affidavit are based upon: (i) my personal knowledge; (ii) information supplied to me by other members of the Debtor's management or other

1656444

professionals; (iii) my review of relevant documents; or (iv) my opinion based upon my experience and knowledge of the Debtor's operations and financial condition.

## OVERVIEW OF THE DEBTOR'S BUSINESS OPERATIONS AND FINANCIAL CHALLENGES

5. The Debtor is an Oklahoma limited liability company formed in 2004 and managed from Edmond, Oklahoma.

6. The Debtor manufactures large steel pole assemblies utilized in traffic control, utility, lighting, and communications at a 192,000 square foot facility located in Claremore, Oklahoma, which facility is leased by the Debtor.

7. The Debtor's steel poles are custom-designed and built for sale across North America. The Debtor is also a licensed private carrier, which allows it to deliver orders itself from its plant to the customer's installation site.

8. The Debtor's business and ability to operate profitably has been strangled by a recent confluence of events. Namely, the Debtor is involved in ongoing litigation with its former president wherein the Debtor alleges, *inter alia*, that over a 10 year period, the former president stole and embezzled millions of dollars from the Debtor. That action, styled *Phillip B. Albert v. Pelco Structural, LLC, et al.*, CJ-2019-439 (District Court for Rogers County, Oklahoma), has been referred to arbitration.

9. In 2016, the Debtor was also sued for breach of contract and breach of warranty by Exelon Business Services Company, LLC ("Exelon"), in a case styled *Exelon Business Services Company, LLC v. Pelco Structural, LLC*, No. 1:16-cv-00611 (N.D. Ill.). Therein, Exelon asserted that cerain conductor cross arms manufactured by the Debtor were defective. In November 2020, a judgment was entered against the Debtor in the case in the amount of $2,749,932.82. In June

2021, Exelon sought to collect on its judgment by, *inter alia*, issuing a garnishment on MidFirst Bank, where the Debtor maintained an operating account, resulting in the freezing of such account. At the time the garnishment was issued to MidFirst, the Debtor had approximately $274,000.00 in such bank account, which it had intended to use primarily for payroll.

10. In 2020, the Debtor was sued for breach of contract, breach of warranty, and fraud by omission by Lone Star Transmission, LLC ("Lone Star"), in a case styled *Lone Star Transmission, LLC v. Pelco Structural, LLC*, No. 4:20-cv-00835 (S.D. Tex.). Therein, Lone Star alleges that certain steel poles manufactured by the Debtor had pre-existing "toe cracks" in the pole at the base plate weld. Lone Star seeks damages in an amount in excess of $15 million in the lawsuit.

11. This series of events has placed the Debtor in a precarious financial situation, with the Debtor being unable to generate positive cashflows. In addition, the collection attempts by Exelon have frustrated the Debtor's ability to operate as a going concern and threatened the company's continued existence. In order to salvage the remaining value of the Debtor's business, for the benefit of all creditors, the Debtor has sought relief under the Bankrutpcy Code.

## THE DEBTOR'S OWNERSHIP STRUCTURE

12. The Debtor's sole member is Pelco Industries, Inc., which is based in Edmond, Oklahoma.

13. The Debtor's Board of Managers is made up of Stephen P. Parduhn and Jeffrey L. Parduhn, both of whom reside in Edmond, Oklahoma.

14. A 25% profits interest in the Debtor is also the subject of the litigation involving the Debtor's former president, Phillip Albert, which is referenced above.

**FACTS SUPPORTING THE FIRST DAY MOTIONS**

15. As explained above, the First Day Motions are designed to permit the Debtor to operate effectively and minimize any disruption caused by the commencement of this Chapter 11 case. I assert that the First Day Motions are vital to the Debtor's successful reorganization.

**I.    Emergency Motion for Interim and Final Orders Authorizing Use of Cash Collateral, Granting Adequate Protection, and Scheduling a Final Hearing**

16. Prior to the Petition Date, the Debtor executed and delivered to Pelco Products, Inc. ("Products") that certain Promissory Note and Security Agreement effective as of July 31, 2017 in the original principal amount of $460,000.00 (the "2017 Note"). A true and correct copy of the 2017 Note is attached to the Cash Collateral Motion as Exhibit B.

17. At the time the 2017 Note was entered into, Products was an affiliate of the Debtor.

18. To secure the indebtedness evidenced by the 2017 Note, the Debtor granted Products a blanket security interest covering the Debtor's inventory, chattel paper, accounts, equipment, and general intangibles.

19. Also prior to the Petition Date, the Debtor executed and delivered to Products that certain Promissory Note and Security Agreement effective as of December 1, 2019 in the original principal amount of $5,365,161.74 (the "2019 Note" and together with the 2017 Note, the "Notes"). A true and correct copy of the 2019 Note is attached to the Cash Collateral Motion as Exhibit C.

20. On March 9, 2020, Structural filed a financing statement with the Oklahoma County Clerk as instrument number 20200309020237020, perfecting its security interests. A copy of the filed financing statement is attached to the Cash Collateral Motion as Exhibit D.

21. The Notes were subsequently assigned to Pelco Industries, Inc. ("Industries"), who is the current owner and holder thereof.

22. Industries is an affiliate of the Debtor.

23. There is currently outstanding under the Notes indebtedness, including principal and interest, of approximately $8 million.

24. The Debtor's profits are primarily generated through the sale of products manufactured by the Debtor. Typically, the Debtor's operations generate accounts receivable that are paid by customers.

25. The Debtor maintains two operating checking accounts: one at MidFirst Bank and one at RCB Bank. The Debtor deposits all cash receipts into these accounts and pays all expenses from these accounts.

26. The Debtor depends on the ongoing use of the cash generated by its business to operate and preserve its assets. Even a brief interruption in the Debtor's ability to use cash proceeds will have a disastrous and damaging effect on the value of the estate.

27. Accordingly, the Debtor must have the ability to use cash collateral to continue to operate and to preserve the value of the estate. If the Debtor is not granted authority to use cash collateral, the value of the Debtor's bankruptcy estate will be damaged and the estate and its creditors will suffer immediate and irreparable harm.

28. Industries has consented to the Debtor's use of its cash collateral.

**II.  Debtor's Emergency Motion for Interim and Final Orders Granting the Authorization to Pay Prepetition Claims of Critical Vendors**

29. In connection with the normal operation of its business, the Debtor relies heavily on certain goods and service providers. The Debtor is a manufacturing company whose business

is dependent on ensuring a proper flow of raw materials needed by the Debtor to produce its end products. A disruption in the Debtor's supply chain could shut down the Debtor's entire business.

30. As of the Petition Date, certain of the vendors deemed critical by the Debtor have outstanding claims against the Debtor arising from prepetition deliveries of goods and/or performance of services.

31. Nonpayment of the prepetition claims of these vendors creates a significant risk of disruption to the Debtor's operations. The Debtor, accordingly, anticipates that payment of the prepetition claims will benefit all creditors because such payment will allow the Debtor's business to avoid a likely loss or gain a likely economic advantage which is disproportionate to the amount of the prepetition claims.

32. The Debtor conducted an extensive analysis and review of its immediate service needs and identified certain vendors shown on Exhibit B to the Critical Vendor Motion who are necessary for the Debtor's ongoing operations and who are owed amounts as of the Petition Date (together the "Critical Vendors").

33. The Debtor is in the process of contacting these Critical Vendors to ensure that the provision of the necessary goods and services continue. Should a Critical Vendor refuse to continue to do business with the Debtor unless the prepetition claim is satisfied (in whole or in part), the Debtor requires the authority to pay that prepetition claim.

34. The Debtor believes that the payment of the Critical Vendors is vital to its bility to continue to operate safely and efficiently, and ot the administration of this Chapter 11 case.

### III. Debtor's Emergency Motion for Interim and Final Authorization to Continue Insurance Programs

35. In connection with the operation of its business, the Debtor maintains worker's compensation insurance through CompSource Mutual Insurance Company ("CompSource") and vehicle, property insurance, and liability insurance, including management and cyber liability coverage (collectively, the "Insurance Programs") through Glenn Harris & Associates, Inc. ("Harris" and together with CompSource, the "Insurers").

36. The Debtor is required to pay premiums in connection with the Insurance Programs (the "Insurance Premiums"). The Insurance Premiums are established and billed by the Insurers on a monthly basis. The approximate monthly premium cost is $17,000.00 to CompSource and $30,000.00 to Harris.

### IV. Debtor's Emergency Motion for Interim and Final Orders Authorizing Debtor to Honor Prepetition Obligations to Employees and Continue Employee Benefits Programs

37. The Debtor employs approximately 126 individuals (the "Employees") and is responsible for regular salary and payroll, which is paid on two week intervals. The approximate cost of the next payroll is expected to be $275,000.00 paid on or about July 23, 2021.

38. In addition to salary and wages, the Employees are: (1) offered private medical insurance and standard vision offered private medical insurance, vision insurance, and life insurance; (2) allowed reimbursement for the cost of boots and uniforms; and (3) provided matching funds for certain contributions to their 401(k)s and Roth IRAs. The monthly costs for the Debtor to maintain the insurance programs is approximately $173,000.00 before reimbursement of a portion from Sooner Care, boot and uniform reimbursement is approximately

$5,700.00, and the 401k and/or Roth IRA matching is in the approximate monthly amount of $2,000.00.

39. In addition to these programs, the General Manager, Bill Cralley, has certain performance bonuses included in his employment agreement. These bonuses could be as high as 20% of Mr. Cralley's salary and are paid annually.

**V.   Debtor's Emergency Motion for Interim and Final Authorization to Maintain Existing Bank Account**

40. The Debtor maintains two business checking accounts (the "Bank Accounts") with MidFirst Bank and RCB Bank (the "Banks").

41. The Debtor routinely deposits and withdraws funds from the Bank Accounts by check, wire transfer, and ACH transfer.

42. The Debtor generates and receives funds primarily from the sale of products manufactured as part of its ongoing business operations.

43. Certain third-parties that the Debtor transacts business with make automatic deposits to the Bank Accounts with proceeds realized from the sale of the Debtor's products.

44. In addition, the Debtor uses the Bank Accounts for, among other purposes, making payments to vendors, employees, taxing authorities, and utility providers.

45. Given the importance of timely making royalty payments and payroll activities, the continued maintenance of the Bank Accounts is necessary to the seamless operation of the Debtor's business.

46. The Debtor believes that its transition to Chapter 11 will be smoother, less costly, and more orderly, and disruption and harm to its operations will be minimized, if the Bank

Accounts are continued following the commencement of this case; provided, however, that checks issued or dated prior to the Petition Date will not be honored absent a prior order of the Court.

VI. **Debtor's Emergency Motion for Interim and Final Orders Granting Authorization to Pay Certain Prepetition Taxes and Fees**

47. In the normal course of its business, the Debtor collects and/or pays the following:[1]

- The Debtor is required to pay taxes on personal property owned, which are typically based on the value of the subject property. The personal property taxes paid fiscal year to date total $52,205.41.

- The Debtor is an Oklahoma limited liability company. Oklahoma imposes a franchise tax on all taxable entities formed or organized in Oklahoma, which tax is paid to the Oklahoma Secretary of State.

- Many municipal, county, and state governments require the Debtor to obtain various licenses and pay corresponding Licensing Fees in order to conduct certain business activities. Typically, these Licensing Fees are payable upon the renewal of the applicable license.

48. At this time, the Debtor believes that it is current on all outstanding tax liabilities.

VII. **Debtor's Emergency Motion for Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services**

49. In the ordinary course of its business, the Debtor obtains utility service from the following providers (collectively, the "Utility Providers"):

a. Oklahoma Natural Gas (gas)
b. Clearwater Utilities (gas)
c. AT&T (phone)
d. Cox Business (phone and internet)
e. City of Claremore (electric, water, sewer)
f. Tri-Star Roll Offs (trash)

---

[1] The Debtor also remits taxes to taxing authorities with respect to federal, state, and local income taxes, social security, and Medicare that the Debtor withholds from employees' wages. Remittance of these taxes to the applicable taxing authorities is addressed in a separate motion filed contemporaneously herewith pertaining to the Debtor's employee wage and benefits programs.

9

50. On average, the Debtor spends approximately $10,250.00 each month for utility services. While the Debtor has paid its utility bills timely, due to the timing of this bankruptcy filing and the fact that utility bills are paid in arrears, there is a period of time for which pre-petition utility obligations have been incurred but not paid.

51. The Debtor believes that the cash flow from operations will be sufficient to pay all post-petition obligations related to its utility services. Monthly bills to the Utility Providers average approximately $10,250.00. The Debtor projects that it will generate positive cash flows during this Chapter 11 case that are more than sufficient to make such payments to the Utility Providers each month. Such projections are more-fully set forth in the Debtor's cash collateral motion, which is being filed concurrently herewith. The Debtor contends that it has demonstrated the ability to pay for future utility services in the ordinary course of business.

[SIGNATURE PAGE FOLLOWS]

FURTHER AFFIANT SAYETH NOT.

_____
Stephen Parduhn, President and CEO of Pelco Structural, L.L.C.

    Before me, the undersigned, a Notary Public, in aforesaid county and state on this _July_ day of _19th_, 2021, personally appeared Stephen Parduhn, in his capacity as President and CEO of Pelco Structural, L.L.C., to me known to be the identical person who subscribed his name to the foregoing instrument and acknowledged to me that he executed the same as his free and voluntary act and deed for the uses and purposes therein set forth.

_____
Notary Public, Commission # _03000243_

(SEAL)

My Commission Expires: _2/2/2023_

11